Filed 3/18/22  P. v. Ramirez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SERGIO ERICK RAMIREZ,<br><br>Defendant and Appellant. | F079515<br><br>(Super. Ct. No. DF013185A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe and John R. Brownlee, Judges.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Sergio Erick Ramirez (defendant) fired a gun at his wife's head after she refused to drive him to illegally purchase prescription medications from a black market dealer.

The Kern County District Attorney charged defendant with (among other conduct) attempted murder (Pen. Code, §§ 664, 187, subd. (a), 189), assault with a semiautomatic firearm (§ 245, subd. (b)) and two counts of criminal threats (§ 422). (Undesignated statutory references are to the Penal Code.)

Prior to trial, defendant requested pretrial mental health diversion pursuant to section 1001.36. Defendant cited his history of opioid abuse and resulting psychiatric disorders as grounds for this relief. The trial court determined defendant was not eligible under the statute and denied his motion.

A jury convicted defendant of the lesser included offense of attempted voluntary manslaughter, assault with a semiautomatic firearm, false imprisonment, criminal threats, and felony child abuse. The trial court sentenced defendant to a determinate term of 32 years 8 months.

Defendant raises several issues on appeal. First, he claims the trial court erred when it denied his motion for pretrial mental health diversion. He challenges the sufficiency of the evidence supporting his convictions for attempted voluntary manslaughter and criminal threat against his daughter, respectively. He claims the prosecutor misrepresented the law during closing argument and consequently committed misconduct. Finally, he notes the trial court improperly calculated his presentence custody credits.

In supplemental briefing, defendant asks for resentencing under Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) and Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567).

We will remand the matter for resentencing in accordance with Assembly Bill 518 and Senate Bill 567. We affirm the judgment in all other respects.

## FACTS

### Background

Defendant and his wife married in 2006. They lived in rural Kern County with their daughter, Minor Doe.

Defendant developed a severe addiction to pain medication and other prescription drugs after a series of surgeries between 2007 and 2014. Eventually, he began spending $400–$500 per week buying pills off the street and taking around 20 prescription pills per day. Defendant's addiction caused his wife to leave in 2016 because he was spiraling out of control and engaging in violent and aggressive behavior. When defendant did not have access to prescription pills, he experienced withdrawal symptoms such as strong headaches, sweating, fever, diarrhea and vomiting.

### The Incident in Question

On November 24, 2017, defendant asked his wife to drive him to buy pills. He became enraged and aggressive when she refused. He went into another room and returned with a gun. He put the gun to his wife's forehead at first, and then grabbed her by her hair, pinned her down to the bed, and pointed the gun at the back of her head.

Defendant told his wife he was not afraid to shoot the gun and he threatened to kill her. As she moved, defendant warned her the gun could easily go off. Defendant told her the weapon "just goes off by [itself]" and "the littlest fucking thing, it'll fucking go off." Defendant also told her "[i]t won't … bother me to put one through your … skull" and that he "won't fucking care."

Defendant's wife was recording him on her cell phone during the altercation and her phone fell under the dresser after defendant attempted to take it from her. He pushed her to the ground in the process.

As she was on the ground in front of him, she heard the firearm go off. Defendant stood a foot behind her. Defendant's wife thought she had been shot because the bullet went by her ear. When she gathered her bearings, defendant's wife saw a bullet hole

3.

lined up with her head in the middle of the mirror in front of her. After the first shot, defendant pointed the gun to his wife's head again and continued to threaten her. He told her, "'The next one, I'm not afraid, it will go through your head.'"

Minor Doe walked into the room and saw defendant standing next to her mother with the gun in his hand. She asked defendant to stop. Defendant told Minor Doe, "'I would never do anything to you, but your mom.'" Defendant's daughter repeated her plea for defendant to "[P]lease don't shoot my mommy" while defendant continued to hold the gun to his wife's head. He told his wife, "Guaranteed if I fucking hear sirens, you're fucked.…" Defendant's wife believed that if police arrived, defendant would kill her.

Defendant would not let his wife or daughter leave when they asked. Defendant's wife then agreed to take him to purchase pills. Before leaving, defendant took his wife and daughter's cell phones. He gave his wife's cell phone back after he purchased his pills and he apologized to her.

### Criminal Charges and Trial

An information charged defendant with (1) attempted premeditated murder, (2) kidnapping (§ 207, subd. (a)), (3) assault with a semiautomatic firearm, (4) criminal threat as to his wife, (5) criminal threat as to Minor Doe, (6) dissuading defendant's wife from reporting a crime using force (§§ 136.1, subds. (b)(1), (c)(1)), and (7) felony child abuse of Minor Doe (§ 273a, subd. (a).)

Prior to trial, defendant moved for pretrial mental health diversion, which the prosecution opposed. The trial court denied the motion.

A jury found defendant guilty of the lesser included offenses of attempted voluntary manslaughter on count 1 (§§ 664, 192, subd. (a)) and false imprisonment on count 2 (§ 237). The jury convicted defendant on the remaining counts as charged.

The trial court sentenced defendant to a total term of 32 years 8 months. The court declared count 3 (assault with a semiautomatic firearm) the principal term and sentenced

defendant to a nine-year base term plus a 10-year firearm enhancement pursuant to section 12022.5, subdivision (a). On counts 2 through 4 and 6 through 7, the court sentenced defendant to a total term of 13 years 8 months.[1]

Defendant timely filed his notice of appeal.

## ANALYSIS

As discussed below, we conclude the trial court properly denied defendant's request for pretrial mental health diversion. We also find sufficient evidence supports defendant's convictions for attempted voluntary manslaughter and making a criminal threat as to Minor Doe. Additionally, defendant waived his claim for prosecutorial misconduct, and his ineffective assistance of counsel argument lacks merit.

However, defendant is entitled to resentencing pursuant to Assembly Bill 518 and Senate Bill 567.

## I. The Trial Court Properly Denied Defendant's Motion for Pretrial Mental Health Diversion

### A. Relevant Factual Background

Defendant moved for pretrial mental health diversion pursuant to section 1001.36. The motion claimed defendant suffered from numerous psychiatric conditions, including "schizophrenia spectrum …, persistent depressive disorder, unspecified anxiety disorder, opioid abuse, and unspecified opioid disorder." It further argued his "schizophrenia, depressive disorder, and anxiety disorder, combined with his addiction to opioid[s] significantly contributed to the incident in this case."

#### 1. Evidentiary Record

The record indicates the trial court considered the following evidence on defendant's motion.

---

[1]On count 5 (criminal threats as to Minor Doe), the court imposed a concurrent sentence of six years. The court also sentenced defendant to 15 years on count 1 (attempted voluntary manslaughter) but stayed that conviction pursuant to section 654.

### a.  Report from Dr. M. Dean Haddock

Dr. Haddock conducted a psychological examination at the Kern County jail at the request of defendant's trial counsel.  Dr. Haddock's report included a heading entitled "DSM V Diagnosis" which listed the following:

"298.9 (F29)      R/O Unspecified Schizophrenia Spectrum & Other Psychotic D/O

"292.9 (F19.159)   Substance/Medication-Induced Psychotic D/O In remission due to controlled environment

"300.4 (F34.1)     Persistent Depressive Disorder (Dysthymia)

"293.00 (F41.p)    Unspecified Anxiety Disorder

"305.50 (F11.20)  Opioid Abuse

"292.9 F11.99     Unspecified Opioid Related Disorder In remission due to controlled environment."

The report also included a discussion of the effects of opioid use disorder.  Here, the report states "[t]here is a direct correlation to [defendant's] Opioid use."  It explained opioid abuse produces brain abnormalities and psychological effects such as anxiety, anger, depression, and reckless behavior.

Dr. Haddock's report recommended six psychotherapeutic treatments:  (1) individual psychotherapy, (2) group therapy, (3) religious counseling, (4) cognitive behavioral therapy, (5) drug rehabilitation, and (6) marriage counseling.  This portion of the report stated "[t]reatment plans should take into account the possibility of disruption due to drug abuse."  Dr. Haddock also opined defendant's addiction "lead [*sic*] to drug seeking behavior in an irrational, psychotic delusional and dangerous fashion."

### b.  Competency Exam of Dr. Kathe D. Lundgren

Dr. Lundgren performed an evaluation of defendant to determine his competency to stand trial.  This report listed the following under the heading "Diagnosis":

"F41.9     Unspecified Anxiety Disorder

"G47.21  Sleep Wake Disorder, delayed sleep phase type,
      Rule Out G47.37 Central Sleep Apnea with opioid use.

"F11.20  Opioid Use Disorder, severe, in sustained remission in a
      controlled environment.

"F13.20  Anxiolytic Use Disorder, moderate, in sustained remission in a
      controlled environment;

"Z69.12  Encounter for mental health services (evaluation) for perpetrator
      of spouse/partner violence, physical.

"F32.9   Unspecified Depressive Disorder, currently in remission due to
      medication treatment.

"Z65.1   Incarceration."

Dr. Lundgren reported defendant was being treated by a psychiatrist and that treatment was effective. Dr. Lundgren observed "anxiolytics and the pain pills have imposed a negative effect on [defendant's] judgment and his behavior" and "[i]f he continues to use these substances, he is definitely a danger to others."

### c.  **Letter From Aspire Counseling**

Finally, the record includes a letter from Evan Cason of Aspire Counseling. The letter states Aspire Counseling reviewed Dr. Haddock's diagnosis and ultimately recommended defendant participate in a 60-day partial hospitalization program followed by a transition to an intensive outpatient program for 90 additional days and then one year of aftercare. The treatment plan also recommended defendant live at a sober living home in connection with his treatment. The report stated the "strict schedule as well as curfew … will give [defendant] the best chance of success."

### 2.  *The Hearing on Defendant's Motion*

Before receiving argument, the trial court issued an oral tentative ruling denying defendant's motion. The trial court concluded defendant met his burden on element 1. However, the court found defendant did not meet his burden "that any of the mental disorders played a significant role in the commission of the charged offense." Here, the court suggested it could "infer" a connection because Dr. Haddock's report stated there

was a "direct correlation to [defendant's] opioid use" but "Dr. Haddock does not say what correlates to that use." Additionally, the court determined defendant failed to demonstrate "defendant's symptoms motivating the criminal behavior would respond to mental health treatment." The court noted there was a treatment plan "set out." However, the court also found there was no evidence the treatment plan was likely to be successful. The court also expressed it was "not satisfied" that defendant would not pose an unreasonable risk to public safety because defendant faced charges for attempted murder, "which is part of the definition of serious violent felony under [s]ection 1170.18," and defendant directed this conduct toward his wife. Accordingly, the court expressed concern defendant might "pose a risk of similar conduct as reflected in the charging allegations in the case."

Defense counsel argued Dr. Haddock's discussion of opioid abuse created a link between defendant's mental condition and the crime because "the opioid abuse brings about the psychotic disorder." Regarding element 3, defense counsel argued the mental health treatment is "to get [defendant] off the opioids," which defense counsel asserted would produce positive effects on defendant's remaining psychiatric disorders. Finally, defense counsel stated opioid treatment would greatly diminish any risk defendant posed to public safety because, "if we can kill his desire to get drugs legally, illegally, or by any means possible, that would be a great lack of risk on the danger to the public."

### 3. The Court's Written Order

The court issued a written ruling denying defendant's motion on February 21, 2019. The order states, in relevant part:

> "While the court is satisfied that the defendant suffers from a mental disorder or disorders which meet the criteria of section 1001.36, subd. (b)(1), the defendant has failed in his burden of proof that any of these disorders played a significant role in the commission of the charged offense pursuant to subd. (b)(2).

8.

"No expert has given that opinion.  Even if the court were to infer that the mental disorders played some role, the court remains unsatisfied, without more evidence (including expert opinion upon the issue), that the diagnosed disorders played a significant role[.]  [F]urther, the defendant has not met his burden to provide the opinion of a qualified mental health expert that the defendant's symptoms motivating the criminal behavior would respond to mental health treatment pursuant to subd. (b)(3).  No expert has given that opinion in the materials that are part of the moving papers.

"Finally, the court is not satisfied that the defendant will not pose an unreasonable risk of danger to public safety as defined in Penal Code section 1170.18, pursuant to subd. (b)(6).  Here the underlying criminal behavior was an attempted homicide with a firearm against his spouse or significant other, who was also a victim of defendant's prior misdemeanor Penal Code section 273.5 offense.  The court has no assurance from the evidence offered that the defendant will not pose a risk of similar behavior notwithstanding mental health treatment."  (Some capitalization omitted.)

## B.      Applicable Law and Standard of Review

Section 1001.36 authorizes pretrial mental health diversion for defendants with qualifying mental health disorders.  (*People v. Frahs* (2020) 9 Cal.5th 618, 626–627 (*Frahs*).)  As used in the statute, "pretrial diversion" means "'postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment ….'"  (*Id.* at p. 626, citing § 1001.36, subd. (c).)

A trial court *may* (but is not required to) grant pretrial mental health diversion if a defendant makes a prima facie showing of eligibility pursuant to the six factors set forth in section 1001.36, subdivision (b)(1).  (*People v. Gerson* (2022) 74 Cal.App.5th 561, 572 (*Gerson*); see *People v. Oneal* (2021) 64 Cal.App.5th 581, 588 (*Oneal*) ["The mental health diversion statute affords the trial court discretion to grant or deny diversion if the defendant meets the statutory eligibility requirements"].)  The six factors determining eligibility are "(1) the defendant suffers from a qualifying mental disorder; (2) the mental disorder was a "significant factor" in the commission of the charged offense; (3) a

qualified mental health expert opines the defendant's symptoms will respond to treatment; (4) the defendant consents to diversion and waives his or her speedy trial rights; (5) the defendant agrees to comply with the treatment as a condition of diversion; and (6) 'the defendant will not pose an unreasonable risk to public safety, as defined in Section 1170.18, if treated in the community.'" (*People v. Moine* (2021) 62 Cal.App.5th 440, 447–448 (*Moine*), citing § 1001.36, subd. (b)(1)(A)–(F).)

If the defendant "makes a prima facie showing that he or she meets all of the threshold eligibility requirements …, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion." (*Frahs*, *supra*, 9 Cal.5th at p. 627.)

Appellate review of a trial court's determinations related to a defendant's eligibility for pretrial diversion triggers two standards of review—"[a] trial court's factual findings under section 1001.36 must be supported by substantial evidence, and the court's diversion eligibility determinations are reviewed for an abuse of discretion." (*Negron v. Superior Court* (2021) 70 Cal.App.5th 1007, 1016; accord, *People v. Moine*, *supra*, 62 Cal.App.5th at p. 448 [concluding the abuse of discretion standard applies "on appeal from a trial court's denial of mental health diversion"]; see *People v. Williams* (2021) 63 Cal.App.5th 990, 1000 [trial court's determination defendant did not meet all the eligibility criteria for pretrial mental health diversion reviewed for abuse of discretion]; see also *Gerson*, *supra*, 74 Cal.App.5th p. 573 ["Ultimately, however, diversion under section 1001.36 is discretionary, not mandatory …. We therefore review for abuse of discretion the trial court's decision whether to grant a request for mental health diversion"].)

For example, in *Oneal*, we applied the substantial evidence standard in reviewing the trial court's finding as to whether the defendant's mental disorder was a significant factor in the commission of the charged offense (§ 1001.36, subd. (b)(1)(B)). (*Oneal*,

*supra*, 64 Cal.App.5th at p. 589.)  Similarly, in *Gerson*, the Fourth Appellate District noted substantial evidence review applies to a trial court's finding under subdivision (b)(1)(A)—whether a defendant suffers from a mental disorder—because it calls for "evaluating expert testimony and making conclusions based thereon …." (*Gerson*, *supra*, 74 Cal.App.5th at p. 573.)

By contrast, in *Moine*, the Second Appellate District concluded abuse of discretion review applies to a trial court's determination under subdivision (b)(1)(F) of section 1001.36–whether the defendant poses an unreasonable risk of danger to public safety. (*Moine*, *supra*, 62 Cal.App.5th at p. 449 ["[W]e conclude [the abuse of discretion] standard applies to review of a dangerousness finding under section 1001.36"].)

Here, the trial court's minute order indicates it denied defendant's motion because he did not meet his burden of proof on subdivision (b)(1)(B), (C), and (F) of section 1001.36.  Essentially, the court deemed defendant statutorily ineligible for pretrial mental health diversion.  (*Frahs*, *supra*, 9 Cal.5th at p. 627 [a trial court may grant pretrial diversion "[i]f the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements"].)

Accordingly, as in *Gerson*, we will review the trial court's factual findings under subdivision (b)(1)(B) of section 1001.36 for substantial evidence.  We will apply the same standard to the trial court's conclusion under subdivision (b)(1)(C) because this prong calls for "evaluating expert testimony and making conclusions based thereon" and so, at its crux, presents an issue of fact. (*People v. Cromer* (2001) 24 Cal.4th 889, 894.) Finally, we will review the trial court's "dangerousness" determination under subdivision (b)(1)(F) for abuse of discretion.  (*Moine*, *supra*, 62 Cal.App.5th at p. 449.)

## C.    Analysis

On appeal, only three of the six prongs in section 1001.36, subdivision (b)(1) are at issue.[2]  With respect to subdivision (b)(1)(B), defendant claims the trial court erred when it found defendant's opioid use disorder was not a significant factor in the commission of the offense because it could only "infer" a correlation between the two. On subdivision (b)(1)(C), defendant claims a qualified expert opined the symptoms of defendant's mental disorder motivating the criminal behavior would respond to treatment.  Finally, defendant claims he demonstrated he would not pose a danger to public safety if treated in the community.

The record on subdivisions (b)(1)(B) and (b)(1)(C) of section 1001.36 is mixed. On one hand, we agree with the trial court that Dr. Haddock's report stopped short of explicitly discussing the connection between defendant's opioid addiction and the attack on his wife.

On the other hand, defendant is correct that the statute does not require an expert to explicitly connect the mental disorder and the offense at issue.  Rather, subdivision (b)(1)(B) authorizes a trial court to conclude a mental disorder played a significant factor in the commission of the charged offense if it reviews "relevant and credible evidence," including "statements by the defendant's mental health treatment provider."  (§ 1001.36, subd. (b)(1)(B).)

Here, defendant claims the court should have found his opioid use disorder was a significant factor in the charged offense.  Presuming this qualifies as a DSM-V disorder, Dr. Haddock's report stated "[t]here is a direct correlation to [defendant's] Opioid use." Dr. Haddock also stated, "It is my professional clinical opinion that [defendant] became addicted to pain medication following his knee surgery [and] [t]he opioid addiction lead

---

[2]The People do not challenge the trial court's conclusion defendant suffered from an applicable mental disorder under section 1001.36, subdivision (b)(1)(A), and the factors in subdivision (b)(1)(D) and (E) are not in dispute.

[*sic*] to drug seeking behavior in an irrational, psychotic delusional and dangerous fashion."

With respect to subdivision (b)(1)(C) of section 1001.36, Dr. Haddock opined "[t]he prognosis for change with appropriate treatment is considered to be fair." Additionally, the letter from Aspire Counseling provides a concrete treatment program that (according to the letter) gave defendant "the best chance at success."

But we also note defense counsel emphasized defendant's "mental health treatment is to get him off the opioids." Dr. Haddock's report seems to leave open the possibility "of disruption due to drug abuse" and does not otherwise address how defendant would respond to treatment for his opioid use disorder. In our view, this means that although Dr. Haddock gave a "fair" prognosis for defendant, the trial court could also conclude that the fact defendant's treatment plan could be disrupted because of his opioid use meant defendant *might not* respond to mental health treatment.

However, we ultimately affirm the decision of the trial court because of its finding on the "dangerousness" prong of subdivision (b)(1)(F) of section 1001.36.

Here, the court must be satisfied the "defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community." (§ 1001.36, subd. (b)(1)(F).) Because of the reference to section 1170.18, section 1001.36, subdivision (b)(1)(F) essentially provides the court must be satisfied defendant will not commit "super-strike" felonies including, but not limited to, murder, attempted murder, or solicitation to commit murder. (*Moine*, *supra*, 62 Cal.App.5th at p. 450; see *Oneal*, *supra*, 64 Cal.App.5th at p. 593 [discussing the "super strike" requirement of § 1001.36, subd. (b)(1)(F)].)

We find the Second Appellate District's recent opinion in *People v. Pacheco* (2022) 75 Cal.App.5th 207 (*Pacheco*) instructive. The defendant in *Pacheco* suffered from schizophrenia and methamphetamine addiction and faced charges for arson of forest land. (*Id.* at pp. 209–210.) He requested pretrial mental health diversion and the trial

court denied the motion because it deemed defendant a danger to the community under section 1001.36, subdivision (b)(1)(F). (*Pacheco*, at p. 212.) The Court of Appeal determined the trial court did not abuse its discretion. (*Id.* at p. 213.) Importantly, it emphasized expert opinion that the defendant's likelihood of reoffending depended on his ability to remain free of methamphetamine and that if the defendant used methamphetamine, he "would become unstable and psychotic." (*Id.* at p. 214.) Accordingly, the Court of Appeal determined the trial court acted within its discretion denying defendant's motion. (*Id.* at pp. 213–214.)

Defendant acknowledges his actions were "serious and violent," but asserts he has a limited criminal history, no history of violent behavior (aside from a 2009 misdemeanor domestic violence charge), and has never been to prison.

Nonetheless, the court found defendant did not meet this prong because he faced charges for attempted homicide on his spouse—a serious, violent felony under section 1170.18. At the hearing, the trial court noted defendant's spouse remained in his "[sphere] of influence or association," and the court was not satisfied defendant "would not pose a risk of similar conduct as reflected in the charging allegations in the case." We also note the record on this motion included a police report that contained victim witness statements (from defendant's wife and Minor Doe) mentioning defendant's threats to kill his wife. Additionally, like in *Pacheco*, Dr. Lundgren observed that if defendant did not remain free of opiates and anxiolytics, he would pose a danger to others. Dr. Haddock also opined his treatment plan should take into account the possibility of disruption due to drug abuse. In light of this, the trial court did not abuse its discretion when it determined defendant did not meet his burden under subdivision (b)(1)(F) of section 1001.36.

Moreover, we reach a conclusion different from several of the published decisions analyzing subdivision (b)(1)(F) of section 1001.36 and concluding the court erred in finding a defendant posed an unreasonable risk to public safety. For example, in

14.

*Williams*, the First Appellate District noted the defendant in question had no prior criminal record and had no prior history of assault or violence. (*Williams*, *supra*, 63 Cal.App.5th at p. 1003.) In *Moine*, the court observed none of the defendant's prior convictions involved a super-strike felony, and the prosecution did not provide evidence the defendant "was likely to commit such an offense in the future, and the circumstances of the pending charges did not support such an inference." (*Moine*, *supra*, 62 Cal.App.5th at pp. 450–451.)

This case is distinguishable on the facts. Here, defendant faced charges for a super-strike offense, and both experts' reports essentially concluded the danger he posed to the community depended on whether he remained free of opiates.

In sum, the trial court's finding on the "dangerousness" prong of section 1001.36, subdivision (b)(1)(F) is appropriate given the circumstances of the case. Because defendant did not meet his burden on this element, he was statutorily ineligible for pretrial mental health diversion. (*Frahs*, *supra*, 9 Cal.5th at p. 627.) We therefore find no error in the court's denial of defendant's motion for pretrial mental health diversion.

## II. Sufficient Evidence Supports the Convictions for Attempted Voluntary Manslaughter and Criminal Threats as to Minor Doe

Defendant next challenges the sufficiency of the evidence on two of his convictions. First, he claims insufficient evidence supports his conviction for attempted voluntary manslaughter. Next, he argues there was insufficient evidence to support his conviction for making a criminal threat as to Minor Doe.

### A. Standard of Review

A challenge to the sufficiency of the evidence triggers the "substantial evidence" test. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.) Our role here is "limited." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138 ["The role of an appellate court in reviewing the sufficiency of the evidence is limited"].) We must "'"review the record in the light most favorable to the judgment below to determine whether it discloses substantial evidence …

15.

such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251, quoting *People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)  This means evidence that is reasonable, credible, and of solid value.  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)  Under this review, "we presume in support of the judgment '"the existence of every fact the trier could reasonably deduce from the evidence."'" (*People v. Nelson* (2016) 1 Cal.5th 513, 550.)  The same considerations apply irrespective of whether the evidence is direct or circumstantial.  (*Ceja*, *supra*, at p. 1138.)  Moreover, "'[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant reversal of the judgment.'" (*People v. Bean* (1988) 46 Cal.3d 919, 933.)

### B.  Analysis

#### 1.  *Voluntary Manslaughter*

On appeal, defendant claims this conviction cannot stand because there was insufficient evidence he intended or attempted to kill his wife.  We disagree.

California law recognizes the crime of attempted voluntary manslaughter.  (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1550 [discussing the crime of attempted voluntary manslaughter]; *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824.)  Pursuant to CALCRIM No. 603, "[a]n attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion." (*Ibid*.)  The elements are:  (1) the defendant took at least one direct but ineffective step toward killing a person; (2) the defendant intended to kill that person; (3) the defendant attempted the killing because he or she was provoked; (4) the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment; and (5) the attempted killing was a rash act done

under the influence of intense emotion that obscured the defendant's reasoning or judgment. (*Ibid*.)

"A defendant's intent is rarely susceptible of direct proof, and may be inferred from the facts and circumstances surrounding the offense." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.) Accordingly, intent to kill "'may in many cases be inferred from the defendant's acts and the circumstances of the crime.'" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1149, quoting *People v. Smith* (2005) 37 Cal.4th 733, 741; see *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1225 ["[e]vidence of a defendant's intent 'must usually be derived from all the circumstances of the attempt, including the defendant's actions'"].)

We conclude sufficient evidence supports the jury's finding that defendant intended to kill his wife. The jury heard defendant's wife's testimony that he placed a gun to her temple and threatened to kill her—including that he "was not afraid to shoot the gun" and that he would "blow [her] brains out." The jury heard the recording of the incident in question and defendant's statement that it would not bother him to put a bullet through his wife's skull. That recording also included audio of the gunshot, defendant's wife's terrified reaction to it, and her testimony that the bullet went right by her head.

Defendant claims there was no evidence he intended to kill his wife because defendant "held the gun a foot away from her and pointed it directly over her head at the wall in a position from which the bullet could not have hit her."

We disagree. "'"[T]he act of firing toward a victim at a close, but not point blank, range in 'a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill ....'"'" (*People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1149 [concluding sufficient evidence supported defendant's conviction for murder where defendant pointed gun at victim and fired it]; *People v. Ramos* (2011) 193 Cal.App.4th 43, 48 [sufficient evidence supported finding of intent to

17.

kill where defendant fired seven times at victim from a distance during the night but victim heard gunshots "whistling" past him as he ran away].)

The bottom line is that the jury heard evidence defendant placed a gun to his wife's temple, threatened to kill her multiple times, and ultimately fired a single bullet near her head and into the wall of their house. On this evidence, a rational trier of fact could find defendant intended to kill his wife beyond a reasonable doubt. (*People v. Perez* (2010) 50 Cal.4th 222, 230.)

As a corollary to this, defendant claims there was insufficient evidence to demonstrate he attempted to kill his wife. On reply, he argues "[a] mens rea without an actus reus does not constitute an attempted killing."

Section 21(a) states that "[a]n attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." Our Supreme Court has stated "[t]he act element of attempt is satisfied when "'a direct but ineffectual act [has been] done toward [a crime's] commission." (*People v. Garton* (2018) 4 Cal.5th 485, 510.) Elaborating on this principle, the court described the "boundaries" of an attempt as follows.

> "For example, if a person decides to commit murder but does nothing more, he has committed no crime. If he buys a gun and plans the shooting, but does no more, he will not be guilty of attempt. But if he goes beyond preparation and planning and does an act sufficiently close to completing the crime, like rushing up to his intended victim with the gun drawn, that act may constitute an attempt to commit murder." (*People v. Johnson* (2013) 57 Cal.4th 250, 258.)

Sufficient evidence supports the jury's conclusion defendant committed a direct act toward killing his wife. Again, defendant placed a gun to his wife's head, threatened to kill her, and ultimately shot at her. She also testified he held the gun to her head after he initially shot at her and threatened her again.

For this reason, we reject defendant's claim. Our job on this issue is to review the evidence in a light most favorable to the trier of fact's conclusion and in support of the

18.

judgment. (*People v. Nelson*, *supra*, 1 Cal.5th at p. 550.) For the reasons described above, ample evidence supports the jury's conclusion that defendant's actions constituted an attempt to kill his wife.

We also reject defendant's suggestion that the verdict cannot stand because there is no evidence of a "clear plan to kill." The prosecution did not need to present evidence of a "clear plan to kill" because it is not necessary to secure a conviction for attempted voluntary manslaughter. As the Third Appellate District stated in *People v. Van Ronk*, *supra*, 171 Cal.App.3d 818:

> "It is true that a person cannot plot in advance to kill in the heat of passion. Such a calculated plan is logically inconsistent with a spontaneous act committed in a moment of passion. But an assailant can form an intent to kill even under a paroxysm of passion. And this is true regardless of whether he is successful or unsuccessful in carrying out his intent. There is nothing illogical or absurd in a finding that a person who unsuccessfully attempted to kill another did so with the intent to kill which was formed in a heat of passion or which arose out of an honest but unreasonable belief in the necessity of self-defense. Under those circumstances, the less culpable person is guilty of attempted voluntary manslaughter rather than attempted murder." (*Id*. at pp. 824–825.)

In sum, defendant's sufficiency of the evidence challenge to his attempted voluntary manslaughter conviction fails due to the overwhelming evidence presented to the jury.

### 2. *Criminal Threat Against Minor Doe*

Defendant next claims there was insufficient evidence to sustain a conviction for making a criminal threat to Minor Doe because he did not direct a threat toward her, but only towards his wife. On reply, defendant presents the hypothetical that "[m]aking a threat to harm person A, thereby causing person B to fear for person A's safety, does not amount to a threat to person B because person B was not the person threatened with harm."

19.

The California Supreme Court states the prosecution must prove five elements to sustain a conviction for criminal threats pursuant to section 422: (1) the defendant willfully threatened to commit a crime that will result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out; (3) the defendant made the threat verbally, in writing, or by means of an electronic communication device that was on its face and under the circumstance in which it was made, so unequivocable, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; (4) that the threat actually caused the person threatened to be in sustained fear for his or her own safety or his or her immediate family's safety; and (5) the threatened person's fear was reasonable under the circumstances. (*In re George T.* (2004) 33 Cal.4th 620, 630.)

The First Appellate District recently dealt with this precise issue in *Ayala v. Superior Court* (2021) 67 Cal.App.5th 296. In *Ayala*, the defendant communicated a threat to his mother that he intended to kill his stepfather for allegedly harming his daughter. (*Id.* at p. 299.) An information charged the defendant with making criminal threats against his stepfather and mother. (*Ibid.*) The defendant moved to dismiss the charge relating to his mother because he contended his mother "was not threatened within the meaning of section 422 because the alleged threat was to kill or inflict physical harm on" the defendant's stepfather. (*Id.* at p. 300.) The trial court denied the motion and the defendant reasserted his argument at the appellate level in a petition for writ of prohibition. The Court of Appeal disagreed and concluded section 422 permitted the defendant to be charged "with separate counts for making criminal threats directed at [the stepfather], the intended target (count 1), and those threats directed at [the mother], the wife of the intended target (count 2)." (*Ayala*, at p. 302.) To reach this conclusion the Court of Appeal analyzed CALCRIM No. 1300 and noted the threat "must be to

unlawfully kill or cause great bodily injury to either the complaining witness or his or her immediate family member." (*Id*. at p. 303.) Thus, "interpreting section 422 to encompass both a violator who threatens another with his or her own death or great bodily harm and a violator who threatens another with inflicting death or bodily harm on a member of that person's immediate family best promotes the Legislature's identified goal of ensuring 'every person [is] protected from fear and intimidation.'" (*Id*. at p. 305, quoting *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221.)

We agree with *Ayala* and find it harmonious with the authority defendant cites. For example, in *People v. Lipsett* (2014) 223 Cal.App.4th 1060, 1065, the defendant yelled "shoot him" or "shoot the dog" to a coparticipant as the victim and his dog confronted the defendant when the defendant was attempting to steal the victim's bike. (*Id.* at pp. 1062–1063.) The defendant challenged the sufficiency of the evidence of his conviction because he did not direct the threat to the victim. (*Id*. at p. 1065.) We disagreed because we determined the language of section 422 "contains no exception for threats that are technically addressed to third parties." (*Lipsett*, at p. 1065.) We remarked the statute "requires that a defendant intend 'the statement … to be taken as a threat' by the victim." (*Ibid*.) However, our holding in *Lipsett* does not present the same fact pattern as *Ayala* and so we do not find it conflicts.

Moreover, *Ayala*'s holding comports with *People v. Solis* (2001) 90 Cal.App.4th 1002 wherein the Second Appellate District wrote section 422 "requires the defendant to willfully make a threat which he intends the listener to understand as a threat and which causes sustained fear in the listener. This constitutes a crime of psychic violence which, if directed at separate listeners (victims) who each sustain fear, can be punished separately." (*People v. Solis*, *supra*, 90 Cal.App.4th at p. 1024.)

Finally, *In re Ryan D.* (2002) 100 Cal.App.4th 854 addressed a different scenario. There, the minor defendant painted a violent picture in art class depicting harm to a school police officer, which was subsequently brought to the officer's attention. (*Id.* at p.

21.

858.) However, the appellate court determined insufficient evidence supported the verdict because there was no evidence the minor intended the school police officer to see the painting. (*Id.* at p. 864.) Thus, *Ryan D.* is unlike the matter before us because it involved a scenario where a third party (a school administrator and art teacher) communicated the violent picture to the intended recipient. (*Id*. at p. 858.)[3] Instead, we find *Ayala* more on point.

Thus, we disagree with defendant's contention that he could not be convicted of a criminal threat as to Minor Doe because he did not direct a threat "at" her, threaten to commit a crime that would result in harm to her, or that he did not intend that Minor Doe take the statement as a threat to her.

To the contrary, the jury heard defendant's statement to Minor Doe that "I would never do nothing to you, but you're [*sic*] fucking mom …." Defendant acknowledged on cross-examination he was "essentially telling [Minor Doe]" he would not hurt her but might hurt her mother. On this evidence, a jury could reasonably conclude defendant intended Minor Doe to take this as a threat to her mother's safety. (See *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348 ["There is no reason for appellant to do what he did and say what he said if he had not had the specific intent that the [victims] interpret his actions as a threat"].) Indeed, Minor Doe testified she was "very afraid" that she or her mom would get hurt that night and so a jury could reasonably conclude that defendant's threat caused her to fear for her and her mother's safety. In our view, the evidence shows defendant communicated a threat to Minor Doe regarding her mother, and so Minor Doe qualifies as a "person threatened" within the meaning of section 422. (See § 422, subd. (a); see also *Ayala v. Superior Court*, *supra*, 67 Cal.App.5th at p. 303 [threat must be directed toward "the complaining witness *or* his or her immediate family member"].)

---

[3]The Court of Appeal also found the painting in question "ambiguous as a threat of an intent to commit murder." (*In re Ryan D.*, *supra*, 100 Cal.App.4th at p. 865.)

The evidence also shows defendant's threat caused Minor Doe to become fearful for her own safety and her mother's. Therefore, we conclude there was sufficient evidence to uphold defendant's conviction for criminal threats as to Minor Doe.

## III. Defendant's Prosecutorial Misconduct Claim Fails

Defendant next argues the prosecution committed misconduct during its closing argument by mischaracterizing the law governing attempt. Defendant acknowledges he posed no objection in the trial court. Alternatively, defendant argues defense counsel's failure to object constituted ineffective assistance of counsel. This claim lacks merit as well.

### A. Relevant Factual Background

At closing arguments, the prosecution told the following to the jury:

"Count 1, attempted murder. And the attempted murder says a direct step. And you've heard the judge. It says it is a direct movement towards the commission of the crime after preparations have been made.

"Preparation, getting the gun. Preparation, opening the box. Preparation, sticking the gun in his pants.

"Direct step, walking into that room. And we'll talk in a few minutes, I'll explain to you about each and every one of those were a direct step, but we might not be here today if the defendant had put that gun in his hands and said, oh, this is a bad idea and abandoned his plan. We wouldn't be here, but that's not what happened that day. That's not what happened on November 24th. The defendant thought about what he wanted to do. The defendant took the steps to put his plan into action.

"Now, Count 1, element one, the defendant took at least one direct but ineffective step toward killing another person. In this case, [his wife].

"So I've listed the direct steps. Left the room to get the gun. Direct step. And we know from his testimony that's why he left the room.

"He went directly to the couch where the gun was kept. Direct step.

"He had to move apart two couches in order to get to the gun box. Direct step.

23.

"He had to then take the box the gun was in and open it.  Direct step.

"He had to remove the gun from the box.  Direct step.

"He then took the gun, put it in his pants.  Direct step.

"Went back into the bedroom where he knew [his wife] was.  Direct step.

"Removed the gun from his pants.  Direct step.

"Held the gun to [his wife]'s head.  Now that's a direct step, but at this point holding the gun to her head, threatening her, and shooting at the wall or at [his wife]—we'll talk about that in a second—those steps are just icing on the cake because right here when the defendant got back into the room, done.  Attempted murder completed.  He had formed his intent to kill [his wife] when he was in the bedroom and decided to get the gun and he had taken the direct step.

"Now, ladies and gentlemen, you only need to find one direct step.  But the defendant himself, when he testified here in court, he provided you all 12 of those direct steps.  He told you himself everything he did.  He told you he decided when he was in the bedroom to get the gun, and he walked us through everything he did up until that moment he shot the gun.  He even explained to us that he had to rack the gun to get the bullet into the chamber and then pull the trigger.  He told you that.  He took the guesswork out of this for you.  He told you he took the direct steps towards killing [his wife].  He did the hard work for you, ladies and gentlemen.

"Now, attempted murder also says a person who attempts to commit murder is guilty of attempted murder even if—even if, after taking the direct step, moving into the bedroom, getting the gun, putting the gun in his pants, even after taking the direct step toward the killing, he abandons further efforts to complete the crime of his attempt fails.

"Even if the defendant had done all of those actions, gotten into the bedroom and said what am I doing, this is crazy, took the gun out of his pants and threw it into the hallway, still attempted murder.  Even though when the defendant shot in the direction of [his wife], but hit the wall instead, the same direction of [his wife]'s face, right where all she could see was the hole in the mirror, not even her own reflection, even though the defendant missed and didn't shoot again, it's still attempted murder."

24.

## B. Analysis

We disagree with defendant's argument for several reasons.

First, this claim is not cognizable on appeal because defendant posed no objection during the prosecution's closing argument. (*People v. Valdez* (2004) 32 Cal.4th 73, 122 [concluding defendant forfeited claim of prosecutorial misconduct where he did not raise it at trial].) "To preserve a claim of prosecutorial misconduct on appeal, "'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]" [Citation.] The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm."'" (*People v. Fayed* (2020) 9 Cal.5th 147, 204; see *People v. Crew* (2003) 31 Cal.4th 822, 836 ["[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury"].)

On appeal, defendant acknowledges this defect. Moreover, his opening brief concedes an objection and request for the jury to be admonished from defense counsel "would have gone a long way toward curing the harm of the comments." Accordingly, we will not excuse his failure to object at the trial court, and his claim of prosecutorial misconduct is forfeited.

Thus, defendant's only resort is to claim trial counsel's failure to object to this portion of the prosecution's argument constituted ineffective assistance of counsel. (*People v. Centeno* (2014) 60 Cal.4th 659, 674 ["'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel'"].) A defendant raising a claim of ineffective assistance of counsel must demonstrate (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's

deficiencies resulted in prejudice. (*Ibid*., citing *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.)

We find no indication from the record that trial counsel's failure to object during the prosecution's closing argument fell below an objective standard of reasonableness. In her closing argument, the prosecutor accurately referred to the trial court's instructions to the jury on the distinction between attempt and preparation. She then cited evidence she characterized as a "direct step" to attempting to kill defendant's wife. At its crux, the prosecution's closing argument falls within the bounds of the significant leeway attorneys are given to apply the law to the facts of a given case. (*People v. Centeno*, *supra*, 60 Cal.4th at pp. 656–657.) Accordingly, it is reasonable under prevailing professional norms that defense counsel posed no objection to the prosecution's description of certain evidence as defendant's "direct steps."[4]

Even if defense counsel's failure to object fell below an objective standard of reasonableness, defendant makes no showing the prosecution's closing argument caused prejudice. The prosecution presented a strong case against defendant, including testimony from his wife and Minor Doe. The jury also heard a recording of the incident taken from defendant's wife's cell phone and received instructions from the trial court concerning the law governing attempts. On appeal we presume "'jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*People v. Potts* (2019) 6 Cal.5th

---

[4]Defendant cites to the California Supreme Court's decision in *People v. Miller* (1935) 2 Cal.2d 527 in support of his argument. *Miller* is not like this case because the defendant did not come within 100 yards of his intended target and only "appeared to be loading his rifle" and never took aim with it. The defendant also surrendered the gun to another person without resistance. (*Id.* at p. 529.)

Nothing from *Miller* supports the claim that the prosecution committed prosecutorial misconduct by misrepresenting the law governing attempts. This case is also distinguishable from *Miller* because defendant shot the gun over his wife's head at extremely close range.

1012, 1037.) Defendant does not direct us to any portion of the record defeating this presumption.

In sum, defendant forfeited his prosecutorial misconduct claim. He also fails to make the requisite showing necessary to prove ineffective assistance of counsel. We find nothing improper in the prosecution's closing arguments and further find no evidence of prejudice.

## IV.     Defendant Is Entitled to Resentencing

Defendant filed supplemental briefing regarding legislation enacted during the pendency of his appeal. First, he claims Assembly Bill 518 entitles him to resentencing because the trial court selected his assault with a firearm charge as the principal term because it carried the longest possible term. He also claims he is entitled to resentencing pursuant to Senate Bill 567 because the trial court imposed the upper term of nine years for the assault with a firearm charge. The People agree defendant is entitled to resentencing.

When the trial court sentenced defendant, section 654 required that an act or omission that was punishable under two or more provisions of law "be punished under the provision that provid[ed] for the longest potential term of imprisonment." (Former § 654, subd. (a), as amended by Stats. 1997, ch. 410, § 1.) Assembly Bill 518 modified section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law "be punished under either of such provisions." (Stats. 2021, ch. 441, § 1.)

Under the rule of *In re Estrada* (1965) 63 Cal.2d 740, 745, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323.)

27.

Here, defendant's total determinate sentence includes the principal 19-year term for assault with a semiautomatic firearm plus the enhancement. The court selected this conviction as the principal term because it carried the "greatest amount of exposure …." The court imposed a 15-year term for defendant's conviction for attempted voluntary manslaughter and stayed the term pursuant to section 654 because "it involves the same elements and operative facts" as [the conviction on assault with a firearm]."

Defendant's sentence is not final because it is presently before us. (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 ["For purposes of the *Estrada* rule, a judgment is not final so long as courts may provide a remedy on direct review"].) Moreover, nothing in Assembly Bill 518 suggests legislative intent that the amendments apply prospectively only. Therefore, we conclude defendant is entitled to the benefit of Assembly Bill 518 and remand is appropriate.

We also conclude defendant is entitled to the benefit of Senate Bill 567. Senate Bill 567 amends section 1170 to make the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist. (Stats. 2021, ch. 731, § 1.3.) The exceptions to the general rule apply when there is a stipulation to, or findings beyond a reasonable doubt (by a jury or the court) of facts that support aggravating circumstances justifying the upper term. (*Ibid*.) Notwithstanding the above, the "court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury [but it] does not apply to enhancements imposed on prior convictions." (*Ibid*.)

The record indicates the trial court sentenced defendant to the upper term of nine years on count 3. At sentencing, it listed certain factors in aggravation, including the fact that defendant took advantage of a position of trust and fired the gun in the presence of his daughter. However, the record does not indicate a jury (or the court) found these factors true beyond a reasonable doubt or that defendant stipulated to them, which is now

required under Senate Bill 567.  Moreover, nothing in Senate Bill 567 suggests an intent that the legislation apply prospectively only.

Therefore, we agree a remand for resentencing is appropriate so that the trial court can sentence defendant in accordance with Assembly Bill 518 and Senate Bill 567.[5]

## DISPOSITION

The matter is remanded for resentencing in accordance with Assembly Bill 518 and Senate Bill 567.  In all other respects, the judgment is affirmed.


                                                                    PEÑA, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.

---

[5]In his opening brief, defendant also asks us to deem the abstract of judgment and clerk's minutes as reflective of the correct sentence because the trial court incorrectly calculated defendant's presentence credits at sentencing.  This issue is moot because we conclude defendant is entitled to resentencing.